### DUKE POWER CO. v. GREENWOOD COUNTY et al.

District Court, W. D. South Carolina.

June 2, 1937.

W. S. O'B Robinson, Jr., of Charlotte, N. C., H. J. Haynsworth and C. F. Haynsworth, Jr., both of Greenville, S. C., W. B. McGuire, of Charlotte, N. C., and R. T. Jackson, of Cleveland, Ohio, for plaintiff.

D. W. Robinson, Jr., of Columbia, S. C., and W. H. Nicholson, and R. F. Davis, both of Greenwood, S. C., for defendant Greenwood County.

Wm. J. Dempsey and Robt. E. Sher, Asst. Counsel, Power Division, PWA, both of Washington, D. C., and John W. Scott, Sp. Asst. to the Atty. Gen., for defendant Harold L. Ickes.

942

GLENN, District Judge.

Previous History of the Suit.

This suit in equity now pending in the Western District of South Carolina has been before the District Court, the Circuit Court of Appeals for the Fourth Circuit, and the Supreme Court. It had been before these courts before it came to the attention of the judge now charged with the responsibility for trial and decision in mid-January of 1937. Originally the matter was heard before the District Judge, who, after considering the testimony taken before a master, granted an injunction. At that time the District Judge wrote an able and exhaustive opinion which is reported in 12 F.Supp. 70. On appeal to the Circuit Court of Appeals the suit was referred back to the District Court under the terms of an order dated December 5, 1935. This was done at the instance of the defendants who wished to have the matter reconsidered in the light of the change in the contract between the Administrator of Public Works and the finance board of Greenwood County with respect to the loan and grant of the money with which to build the municipally owned power plant on the Saluda river near Greenwood. Certain proceedings were then had in the District Court at Spartanburg, December 12 and 13, 1935. Upon the case going back to the Circuit Court of Appeals it was argued and decision rendered. This decision, reported in 81 F.(2d) 986, was in favor of the defendants generally and reversed the District Court. Upon appeal to the Supreme Court (299 U.S. 259, 57 S.Ct. 202, 206, 81 L.Ed. 178), the Supreme Court found that there had been substantial irregularities in procedure which it could not overlook and remanded the case to this court with directions. The final paragraph of the Supreme Court's opinion reads as follows:

"Delusive interests of haste should not be permitted to obscure substantial requirements of orderly procedure. There is no exigency here which demands that these requirements should not be enforced. The cause was heard in the Circuit Court of Appeals upon a record improperly made up. That the cause may be properly heard and determined, we reverse the decree of the Circuit Court of Appeals and remand the cause, with directions that the decrees entered by the District Court be vacated, that the parties be permitted to amend their

pleadings in the light of the existing facts, and that the cause be retried upon the issues thus presented.

"We express no opinion on the relevancy or effect of the evidence or otherwise upon the merits."

The mandate ends with the following:

"On consideration whereof, It is now here ordered, adjudged and decreed by this Court that the decree of the said United States Circuit Court of Appeals in this cause be, and the same is hereby, reversed.

"And it is further ordered, That this cause be, and the same is hereby remanded to the District Court of the United States for the Western District of South Carolina with directions to vacate its decrees and for further proceedings in conformity with the opinion of this Court.

"December 14, 1936.

"You, therefore, are hereby commanded that such further proceedings be had in such cause, in conformity with the opinion and decree of this Court, according to right and justice, and the laws of the United States, ought to be had, the said writ of certiorari notwithstanding."

### Present Status of the Suit.

Initially, therefore, we find the problem of ascertaining with accuracy the status of the suit as it stood before this court in January, 1937, when the mandate was actually filed in the office of the clerk for the Western District of South Carolina. Various contentions are made thereabout but the court is of the opinion that the case is back here for a trial de novo upon reformed pleadings. The reformation in the pleadings, responsive to the changes in the factual situation and resulting largely from the substitution of the new contract for the old, have been made and allowed by this court. These changes in pleadings were made as a first step in the retrial of the case after return to the District Court. Upon the case being assigned to me for hearing and decision, attorneys for all parties promptly appeared before the court on January 19, 1937, and after considerable discussion of the meaning of the mandate of the Supreme Court, the following changes were made.

On that date this court signed an order, pursuant to the mandate, vacating the previous decrees of this District Court. The order in the second paragraph thereof allowed the defendants three days within which to file supplemental answers; the short time being accounted for by the desire for expeditious trial. The plaintiff was allowed ten days in which to file a reply to these supplemental answers. It was understood and conceded by all that these changes in the pleadings were the changes which were proper to carry out the following instructions contained in the opinion of the Supreme Court, to wit: "That the cause may be properly heard and determined, we reverse the decree of the Circuit Court of Appeals and remand the cause with directions that the decrees entered by the District Court be vacated, that the parties be permitted to amend their pleadings in the light of the *existing facts,* and that the cause be retried upon the issues thus presented." (Italics ours.)

As a matter of substance the issues thus presented are properly stated, we think, in these supplemental answers and the resulting reply. The order signed by this court on January 19, 1937, preamble omitted, is set forth in full as a note in the margin.[1]

After much argument and discussion of the exact status of the case, this court is of the opinion that none of the former rulings of the District Judge, nor of the Circuit Court of Appeals on questions of either fact or law, constitute findings and decisions which are now binding upon this court on the doctrine of the "law of the case." Confessedly the opinion of the Supreme Court of the United States is not the law of the case, nor does it afford us binding guide for the decision

---

[1] Now, therefore, in pursuance of said mandate, it is ordered, adjudged, and decreed as follows:

1. That the said decrees of this court entered in this cause on August 26, 1935, and on December 21, 1935, be, and the same hereby are, vacated, to the end that further proceedings may be had herein in accordance with said mandate.

2. That the defendants be, and they hereby are, allowed three days from the date hereof within which to file supplemental answers, and that the plaintiffs be, and they are hereby, allowed ten days hereafter within which to file replies to said supplemental answers.

3. That further proceedings be had herein in conformity with the opinion of said Supreme Court, and that the parties may apply, upon due notice to this court, for such other and further orders and directions as may be necessary.

of questions of law and fact, so far as the merits are concerned. The opinion declares that the decision of the court, dealing with the procedural questions, is in no way binding on the lower courts on the questions of admissibility of testimony, factual findings, or decision of the several definite legal points involved. We find in the opinion words which positively negative such intention. The guidance which we get, therefore, from the previous decisions of the District Court, the Circuit Court of Appeals, and the Supreme Court is that which learned opinions of able courts always furnish from the standpoint of reasoning and decision about the matters involved in a controversy. Decisions in the previous history are not, in our view, binding on the theory of the law of the case. We, therefore, have entered upon the trial of this case impressed with the duty and responsibility of trying it de novo, which we believe is the force and effect of the opinion of the Supreme Court and the definite wording of the mandate remanding the case to this District Court.

Our failure, therefore, to be controlled by the previous opinions, previous findings of fact, and conclusions of law, is not to be construed in any way as lack of respect for the District Court or the Circuit Court of Appeals, but is to be construed as the result of independent thinking under a sense of responsibility for the decision of this case in a de novo fashion. It is contended that the findings of fact as rendered by the District Court are binding on this court. We may adopt and use some of them and to that extent will feel ourselves indebted to his honor Judge Watkins for the painstaking and able work which he has previously done, but we do not conceive that we are bound by them. During the course of this trial evidence was introduced which was not before him, we have allowed evidence which he did not allow to be introduced, and manifestly it cannot now be said that the findings of fact on the first trial are binding upon us.

It must be also declared, and the defendants' counsel are very frank in their admission thereabout, that the opinion of the Circuit Court of Appeals as rendered on February 22, 1936, and reported in 81 F.(2d) 986, is itself not binding upon this court vested with the responsibility for the retrial of this case. We think that this would follow from the application of well-settled principles of law, but we think it also follows from the definite wording of the opinion and mandate of the Supreme Court. If the findings of fact as made by the previous District Judge were binding upon us, or if the opinion of the Circuit Court of Appeals constituted the law of the case, our problem would simply be to combine the two binding factors into a formal decree and make it effective by signing it and filing it in the office of the clerk. Unfortunately no such easy solution of the controversy involved in this suit is possible to this court. The very statement of such a solution, involving as it would the shifting of responsibility to abler and more honored judges, is a temptation, but we do not conceive that such a course is possible here—it is not permitted by the law— it would not be in obedience to the mandate of the Supreme Court.

While counsel have not conceded that this statement of the status of the case before this court is altogether correct, they have proceeded to the trial and argument of the case with full knowledge that the foregoing is a statement of the court's view thereabout and they have not been misled into trying the case without knowing that the court was considering it from the very beginning as a trial de novo on reformed pleadings. An examination of the record plainly shows that the court fully advised counsel for all parties of its views thereabout and the trial was conducted with this view constantly in the minds of all participants. So far as the presentation of the evidence is concerned, however, the court is indebted to counsel for stipulations which saved a great deal of time and which presented to this court, receiving it as de novo evidence, much of the evidence in exactly the same shape as it had been introduced on the first trial. For the fine spirit of co-operation and helpfulness, we commend counsel for all parties. In this regard this court cannot go farther without expressing its gratitude and admiration for all counsel—the trial was had in four days which would otherwise have taken four weeks. This evidence was received by the court as if being offered originally before it and we make this plain because the evidence presented in the trial of this case falls into several classes so far as its history is concerned. For example, there was the testimony originally taken before the master, there was testimony taken before Judge Watkins in Spartanburg in December, 1935, pursuant to the remand

order of the Circuit Court of Appeals, and finally there was the evidence actually introduced for the first time before this court, hearing and seeing the witnesses originally. Where any of the evidence by stipulation was received by this court trying the case in February, 1937, at Rock Hill, S. C., which had previously been received into the case either as being taken by the master or being taken by Judge Watkins in Spartanburg, it was received by this court as being original evidence introduced directly before the court itself. The stipulations simply removed the necessity of producing the witnesses again or reading again into the record of lengthy documents. We trouble ourselves and the readers of this record to make this plain in the hope that again there may be no misunderstanding as to the ideas of procedure which were entertained by the court trying the case. It would be grievous if this court were to leave the situation in an indefinite state so far as the status of the case and the way in which the evidence was received are concerned.

### Analysis of the Legal Issues.

We have in the foregoing paragraphs stated the history of the case up to date and our conception of its present status. These suits by utilities seeking injunctions against the Federal Emergency Administrator of Public Works and local agencies who are planning to build local power plants with federal loans and grants are now fairly common. A number of them have been before Circuit Courts of Appeal but none except this case has heretofore reached the Supreme Court of the United States. The issues are well understood by the bench and the bar and the public generally for that matter.

This particular bill in equity was filed in this court against Greenwood County and its finance board seeking an injunction against the construction of a municipally owned power plant near Greenwood. The power plant which was to be built with money coming from a loan and grant agreement with the Federal Emergency Administrator of Public Works was to be a hydroelectric plant with a dam across the Saluda river at a location popularly known as "Buzzard Roost." Mr. Ickes, as Federal Emergency Administrator of Public Works, was made a party defendant by order of this court dated December 4, 1934.

The bill asked for a temporary and a permanent injunction against the defendants going forward with this project on the ground that it would be bringing about irreparable injury to the plaintiff, which company is enaged in the sale of power in Greenwood, Laurens, and Newberry counties, to which area the new plant proposes to furnish electric power.

It is asserted that the plaintiff is entitled to relief on arguments which are summarized as follows:

First, that the plaintiff has a right to bring this suit and ask for an injunction against the irreparable injury about to be sustained from competition and indirect but nevertheless actual and substantial regulation.

Second, that the statutes on which the action of the Administrator and the county are based do not, when properly construed, authorize what the Administrator is undertaking to do in this case.

Third, that these statutes properly construed, even if they do embrace what is sought to be done here, are unconstitutional and void. Three reasons for their unconstitutionality are set up. First, that the statutes involve an unconstitutional delegation of legislative power to the administrative agency. Second, the thing sought to be done by the Administrator and the local agency with the expenditure of federal funds is not within the powers delegated to the federal government under the Constitution. Third, that when the nature of the thing sought to be accomplished is viewed in the light of its reasonable, probable, and even necessary result, it amounts in substance to an invasion of the powers reserved to the states and to the people under the Ninth and Tenth Amendments to the Federal Constitution; that the net result of the whole scheme, in which the contract is an essential, but not an all-inclusive part, operates to bring about a result that is inadmissible in view of the Federal Constitution.

The bill is answered by the contentions on the part of the defendants that the expenditure is justified under the General Welfare Clause of the Constitution (article 1, § 8, cl. 1) as construed in the case of United States v. Butler, 297 U.S. 1, 56 S. Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. That in any event the appropriation is made primarily for the purpose of relieving unemployment, both direct and indirect, and

is therefore for the general welfare. That in any event there is no coercion by the federal agencies and that the loan and grant are only made upon the application of the local agency, acting freely and voluntarily, and that the federal government is no more than a giver of gifts and a buyer of bonds. The final answer is that in no event is there any invasion of the Ninth or Tenth Amendments or any of the reservations of powers to the people and the states which are found within the Constitution. By way of answer, it is asserted that, whatever regulation may result, such regulation is so incidental and so remote that it is not the type of regulation of intrastate activities which is beyond the power of the federal government. Finally the answers say, adopting the legal positions taken by previous courts, that the only damage resulting to the plaintiff would be damage from competition per se and amounts to damnum absque injuria. The argument is made then that the plaintiff is in no way entitled to the injunction sought because no right, legal or equitable, is about to be violated.

In our opinion the higher courts have attached considerable importance to the changes which have been made in the contracts evidencing such loan and grant agreements between the Administrator and the local authorities. In the instant case, the real heart of the Supreme Court's remand is found, we think, in the fact that there had not been sufficient independent treatment of the effect of the change in the contract. Had the Supreme Court not considered that the change effected between the first trial and the hearing before Judge Watkins in Spartanburg in December, 1935, was of great importance, it would hardly have remanded the case for a trial de novo.

 It is plain, therefore, that the solution of the problem will turn largely upon the interpretation of paragraph 12 of the loan and grant agreement dated November 30, 1935, because paragraph 12 is the substance of the change that was effected by the new loan and grant agreement. We cannot treat lightly the insertion of this paragraph in the contract. Confessedly also it was an attempt to remedy the original vice in the Administrator's legal position to which attention had been called by the opinion of Judge Watkins and other decisions of federal courts. The curative effect must, therefore, be liberally interpreted. On the other hand, to state the plaintiff's contention briefly, the parties cannot by the insertion of a carefully worded paragraph cure a defect which permeates the entire program of the Administrator and set out in the contract as a whole. In short and to be specific, if the only reasonable, the necessary and the inevitable effect of the contract as a whole, and the fulfillment of it in a reasonable way, is to defeat the intention expressed in paragraph 12, then it would be substituting words for substance to allow paragraph 12 to control our findings of fact. In short the government and the finance board cannot say in paragraph 12 that they have no intention of allowing the Administrator or his representatives to have anything to do with the control and the operation of the plant, if the only reasonable and inevitable consequence of the operation of the plant under the contract will be to bring about this result. Words in a contract which negative the whole proposition and scheme of the activities dealt with by the contract as a whole cannot be allowed to control the interpretation thereof. It is significant in this connection to point out that Mr. Ickes, himself, confesses that paragraph 12 was drawn after the reading of the court decisions and frankly admits that it was an effort to cure, at least in words, the vice which had been found by two courts to be inherent in the original contracts. We, therefore, do not subscribe to the argument advanced from time to time by counsel for the defendants that the whole inquiry is put at an end when our attention is directed to paragraph 12 of the contract of November 30, 1935. We must still investigate the factual question of what is the natural and probable and the inevitable effect of the construction of the plant and the carrying out of the contract as a whole. To fail to do so would be stultifying ourselves and solacing our consciences by attributing to the words used in paragraph 12 a magical, curative effect which it is impossible to attribute to them. The fact that the Administrator says that he will no longer seek to control the rates charged by the finance board of Greenwood County, that he will no longer require the passage of formal resolutions as to rates, is not going to destroy the dam when it is constructed, nor will the carefully guarded words found in paragraph 12 stop the flow of electricity along the lines to be built with the money furnished under the terms of the contract.

So, welcome as it would be to find such an easy solution to the difficult case, we cannot in honesty say that the change·from the original form, confessedly vicious, to the form found in paragraph 12, disposes completely of the issues raised by the plaintiff's bill. We must investigate the entire factual situation and say whether or not paragraph 12 can stand up legally and constitutionally when the rest of the contract and its natural and probable consequences are subjected to the tests which are brought into play by the issues raised in the pleadings. A man is presumed to intend the natural and probable consequences of his acts. Furthermore when simultaneous statements made in a semiofficial manner evidence the intention to accomplish a result which is claimed to be illegal; when even the sworn testimony in an open court of a Cabinet officer admits that the natural and probable result of the construction of such plants will be to indirectly bring about the regulation of rates charged by local companies, then the declaration of an intention to not control the rates of local utilities can hardly be said to furnish a complete answer to the factual inquiry. So regardless of the final decision of the entire case, it is plain that the plaintiff is entitled to have the case considered and the decision made from the evidence adduced on the entire case and not to be given as a result of well chosen words contained in paragraph 12 alone. Confessedly the original contract reserved to the federal agencies powers which would have vitiated the whole program. The question now before us is, does the reformed contract so cure this vice as to remove the constitutional weakness of the whole program? It is true that the contract is not the entire case but it is the controlling piece of evidence in the case because the contract fixes the rights of the Administrator and the finance board of Greenwood County. We must take the contract as it now exists and are not free to speculate about the changes in the contract which may be made in the future. Should a substantial change be made then there would be a substantial change in the evidence to be presented to a court.

As courts have considered these cases in which utilities have sought injunctions against the building of municipally owned, competitive, and duplicate power plants with federal money, there has developed a line ·of decisions in which the decision has turned on the point that the plaintiffs are not entitled to injunctions regardless of the constitutionality of the basic statutes involved. This doctrine has been especially applied in the following cases: Greenwood County v. Duke Power Company, 81 F.(2d) 986 (C.C.A.4th); Arkansas-Missouri Power Co. v. City of Kennett, 78 F.(2d) 911, 914 (C.C.A.8th); Cf. Allegan v. Consumers' Power Co., 71 F.(2d) 477 (C.C.A.6th); Kansas Utilities Co. v. City of Burlington, 141 Kan. 926, 44 P.(2d) 223; Alabama Power Case (Alabama Power Co. v. Ickes), 91 F.(2d) 303, just decided by the Court of Appeals for the District of Columbia.

The underlying principle of these five decisions is this, as we understand it, that no matter how the Administrator may have exceeded his constitutional powers, no matter even if the statute on which he acts is unconstitutional as applied to this kind of action, nevertheless that the plaintiff utilities whose damage is sustained solely by reason of competition are about to sustain a damage which is "damnum absque injuria" and, therefore, have no cause of action. To state it as one of the counsel has stated it in arguing two of these cases to this court, that the injection of competition in the stream of proximate cause injects an insulation which protects entirely and completely from legal liability. It is said, when we read these decisions, that no cause of action will lie because there has been no invasion of any legal or equitable right of the plaintiff companies. It is said that no invasion of right is shown because the competition to be furnished by the municipally owned plant is in itself legal. We are endeavoring to ascertain and to state the reasoning which underlies all of these decisions for, unless the fundamental principle is sound, then the decision of this case cannot be rested on such principle simply because it may be fitted conveniently into a jig saw puzzle in which the stated cases comprise the remainder of the desired figure. The idea of case law is carried to extreme perhaps in America, but we are unwilling to decide the case merely because this case may fit conveniently into the pattern already drawn by other decisions.

The fundamental principle is this, that the law is so jealous of protection of competition that where the damage to the plaintiff companies depends entirely upon damage arising from competition, whether such damage be actual destruction

of plaintiffs' business or indirect regulation of earning power, there no cause of action will lie for conduct which in any way aids or abets such competition. In so many words do we understand the decision of the Circuit Court of Appeals of the Fourth Circuit. So spoke the Court of Appeals of the Eighth Circuit, so spoke the Court of Appeals of the Sixth Circuit, and so recently has spoken the Circuit Court of Appeals, as it is now called, of the District of Columbia. Therefore, we must find as follows if we enforce this general rule, that, even though the Administrator may be violating the Constitution of the United States in allocating the federal money for this project, even though Greenwood County may be acting unconstitutionally in surrendering its voice in the matter to the federal agency, yet because the net result of all this is simply to offer competition to the plaintiff company, the plaintiff company cannot complain and its rights have not been invaded. On this theory the government becomes then, as admitted somewhat reluctantly we observe by Judge Groner, simply a buyer of bonds and a giver of gifts. It is then Greenwood County, a South Carolina municipal subdivision, which is the active agent who competes with the Duke Company. That the Duke Company not being protected in any way from competition with a plant owned by Greenwood County has no right invaded, although Greenwood County may obtain the money with which the competition is financed in an illegal manner. To this doctrine the Circuit Court of Appeals for the Fourth Circuit have confessedly subscribed as applied to the facts of this case. The statement of the doctrine has for some time bothered this court because it seemed to be an actual limitation upon the principle of law which the Anglo-Saxon jurisprudence has regarded as sacred; the principle summed up in the maxim "ubi jus ibi remedium." But an answer to this fear is found in the statement that there has been no invasion of rights because no rights of this character existed. Therefore, the failure of the law to afford a remedy here is not a violation of the sacred fundamental principle. In short, it is said that the utilities are guaranteed by neither state nor federal law to be freed from competition from municipally owned plants and no matter how illegal the construction of the plant may be, that, if the only way that it bears upon or has any effect upon the complaining plaintiff is through the channel of competition, then there is no invasion of right. It is declared that there is no "injuria" in the strict legal sense of that word. That, therefore, there being no invasion of the right to be protected by any law, there is no duty upon the law to afford a remedy. If the foregoing reasoning is correct, and still our sense of justice is offended, the answer is that the sanction is political and legislative and not judicial.

While we do not wish to be understood as following, in our thinking, all of the cases cited by the various Courts of Appeal, we cannot lightly consider the fact that such a precedent has been laid down by so many eminent courts. Particularly do we remind ourselves at this junction, and the chance reader of this opinion as well, that the majority of the Circuit Court of Appeals of this circuit has already said that this is the law applicable to this situation. In the earlier paragraphs of this opinion we have stated that we do not consider this former opinion as being the "law of the case" in the strict binding sense of that term, we do think, however, it is correct to say that, where the majority opinion of the appellate court of this circuit has already declared the rule of law applicable, there certainly must be some substantial change in the factual or legal situation to justify this court in refusing to follow such an opinion. On this phase of the case there has been no change in the factual showing of any importance at all. The evidence on the question of competition and reasonable inferences to be drawn therefrom are the same today before this court as they were when the Circuit Court of Appeals of the Fourth Circuit wrote its opinion in February of 1936. Instead of there being a change in the law on this phase of the case, the position of the Circuit Court of Appeals as there set forth now has the indorsement of three other courts of equal rank. Therefore, this court should not hesitate because of some small doubt which it may entertain as to the correctness of this legal proposition. To state the doctrine in its final form we quote from the Circuit Court of the Eighth Circuit in the Kennett Case: "We know of no rule of law, however, which permits one indirectly hurt * * * by a government expenditure, to question the power of the government to make it. In fact, the rule is to the contrary."

We do not agree that the case of New Orleans, M. & T. Railroad Company v.

Ellerman, 105 U.S. 166, 26 L.Ed. 1015, supports the conclusion for which it is cited as authority, but this does not keep the rule as abundantly sustained by other authority from being binding upon us. Furthermore, we are greatly struck by the following observations of Judge Soper: "The power company has such an interest in the business as to justify its suit. The practical effect upon its valuable property interests is manifest. It has an interest far more weighty than that of a federal taxpayer, which in Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078, was held to be too remote, uncertain, and insignificant to entitle him to injunctive relief against an invalid federal appropriation. The plaintiffs here conform to the rule laid down in that case since they show not only that the act of the administrator was invalid, but that they are in danger of sustaining a direct and substantial injury therefrom." 81 F.(2d) 986, 1001.

However, after considering the whole matter and after full realization that substantial damage is certain to result to the plaintiff company here within a limited area, we are forced to the conclusion that such damage so far as it results from competition alone results from no invasion of the plaintiff's rights; that, therefore, the damage is damnum absque injuria and that the plaintiff is not entitled to the relief sought.

When the Duke Power Company made its investment in and around Greenwood it was charged with the knowledge that such investment ran the risk of being damaged by competition. It was in the eyes of the law charged with the knowledge that such competition might come either from another private utility or that it might come from a municipally owned plant—competition from either source would be legal under their franchise and under the law of South Carolina. The higher courts have now held that the financing of such competition by loan and grant from the federal government does not render such competition illegal and it must, therefore, follow, if this proposition is correct, that the plaintiff company is not entitled to its injunctive relief as sought in this bill.

All of the cases taking this point of view have relied strongly upon the reasoning found in Puget Sound Co. v. Seattle, 291 U.S. 619, 621, 54 S.Ct. 542, 545, 78 L. Ed. 1025. The opinion in that case does seem to sustain the decisions which rely on it. There the utility company resisted the tax because the city operated a plant exempt from taxaton, in competition with the private enterprise on which the tax was levied. Dealing with this question afforded the Supreme Court an opportunity to discuss the general question of competition between municipally owned plants and privately owned plants. We find for example the following language: "In conducting the business by state authority, the city is exercising a part of the sovereign power of the state which the Constitution has not curtailed. The decisions of this Court leave no doubt that a state may, in the public interest, constitutionally engage in a business commonly carried on by private enterprise, levy a tax to support it, Green v. Frazier, 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878; Jones v. Portland, 245 U.S. 217, 38 S.Ct. 112, 62 L.Ed. 252, L.R.A. 1918C, 765, Ann.Cas.1918E, 660, and compete with private interests engaged in a like activity, Standard Oil Co. v. Lincoln, supra [114 Neb. 243, 207 N.W. 172, 208 N. W. 962, affirmed 275 U.S. 504, 48 S.Ct. 155, 72 L.Ed. 395]; Madera Waterworks v. Madera, 228 U.S. 454, 33 S.Ct. 571, 57 L. Ed. 915; Helena Waterworks Co. v. Helena, 195 U.S. 383, 25 S.Ct. 40, 49 L.Ed. 245."

Over on page 625 of 291 U.S., page 545 of 54 S.Ct., 78 L.Ed. 1025, we find language very helpful in the consideration of this case: "The injury, which appellant fears may result, is the consequence of competition by the city, and not necessarily of the imposition of the tax. Even without the tax, the possibility of injury would remain, for the city is not bound to conduct the business at a profit. * * * Legislation may protect from the consequences of competition, but the Constitution does not. Helena Waterworks Co. v. Helena, supra; Vicksburg v. Henson, 231 U.S. 259, 34 S.Ct. 95, 58 L.Ed. 209. The Fourteenth Amendment does not purport to protect property from every injurious or oppressive action by a state, Memphis Gaslight Co. v. Shelby County, 109 U.S. 398, 400, 3 S.Ct. 205, 27 L.Ed. 976; St. Louis v. United Railways Co., 210 U.S. 266, 276, 28 S.Ct. 630, 52 L.Ed. 1054, nor can it relieve property of congenital defects, Madera Waterworks v. Madera, supra, 228 U. S. 454, 456, 33 S.Ct. 571 [57 L.Ed. 915]. It does not preclude competition, however drastic, between private enterprises or pre-

950

vent unequal taxation of competitors who are different. Those were risks which appellant took when it entered the field. No articulate principle is suggested calling for the conclusion that the appellant is not subject to the same risks because the competing business is carried on by the state in the exercise of a power which has been constitutionally reserved to it ·from the beginning."

So far as competition per se and the resulting damage are concerned we are, therefore, willing to follow the above-cited cases and we think that their reasoning is at least highly persuasive, on the whole case, but right to be free from competition is not the only right which the utility company has under our federal and republican form of government. The competition complained of and which does cause an actual loss in dollars and cents by reason of the loss of business is a loss which might come under the legal classification of damnum absque injuria; however, the instant plaintiff has another right —it has a right to have its intrastate activities regulated by a state agency if regulated at all. Here we may find the Latin phrase inverted and we may come to a situation aptly described as being "injuria sine damno." Whatever regulation of intrastate transactions is to be had must be state and not federal regulation, if, therefore, we concede that no invasion of right arises from the competition per se and the resulting loss in money, this does not necessarily mean that the right to insist upon state regulation rather than federal regulation is not an independent right existing entirely apart from whatever rights the company may or may·not have to be free from competition. Quite apart from the loss of money due to competition the company may sustain an "injuria" by reason of having its right of state regulation taken away and federal regulation substituted therefor. In other words, the right to live under a republican form of government is a right which no one would gainsay, the right to live under our federal system of government is a right which no·one would attempt to deny to any person, natural or artificial. One of the rights under our federal system of government is the right to have intrastate matters and transactions controlled by the local government. The question is not which one of the controls is more beneficial to the particular person or his business. It may be that the state regulation of the utility is more to be dread-

ed than the federal regulation. Historically the utilities have been complaining more of state regulation and under the Fourteenth Amendment have been seeking protection of the federal courts from the hardships of state regulation. Now the utility complains and says that the result of the whole scheme is to violate its absolute right to have these matters regulated by state authorities. It takes the legal position that, regardless of whether the effect is beneficial or detrimental, this absolute right, guaranteed by the Federal Constitution, is about to be violated and that there is a threatened injury to this absolute right essentially constitutional in nature. So we say when this view is carefully considered that this court does not concede that the case can be dismissed purely on the competition theory. Reluctant as we are, we are forced to the conclusion that the opinion of the Circuit Court of Appeals for the District of Columbia does·not examine the question of the degree to which the whole plan and its consummation will violate an utility company's absolute right to have its business, so far as the business is purely intrastate, regulated by state and not federal agencies. It is our view that it would be a violation of the Tenth Amendment to accomplish federal regulation of the local intrastate transactions to a substantial degree and thus displace state regulation even if this result was brought about through a loan and grant agreement resulting in the building and operation of a municipally owned and federally aided power plant. Indeed it was admitted during argument that the federal government would have no right to come down to Columbia, the state capital, and set up a federal board for the control of utility companies operating in South Carolina. This would be the extreme of federal regulation and would be clearly unconstitutional. It was further admitted that, if in the contract and in the scheme of operations the federal government sought and obtained, whether by purchase of compliance or by demand of conditions precedent, rights which amounted in substance to a reservation of control by the federal government, this too would be unconstitutional. The Administrator himself has practically conceded this question by excluding from the later contract all of the reserved powers over rates which were included in the original contract. Now, if we find that the inevitable, direct, and substantial result of the loan and grant agreement and its

consummation will be substantially to supplant state regulation with federal regulation, then we are forced to hold that the absolute right of the plaintiff has been invaded, and if imminent danger and loss will follow then the plaintiff is entitled to injunctive relief. But. if from the facts of the case it appears that the plan as a whole is constitutional under the general welfare clause and under our theory of one sovereignty aiding another, hereinafter more fully developed, and if the regulatory effect is merely incidental, immaterial, and remote, then we must deny the desired relief. In short, if regulation is so essentially a part of the scheme as it was in the Butler Case as to vitiate the entire program, the decision must be for the plaintiff. If on the other hand the very nature of the resulting regulation is slight and incidental and· does not amount to a substantial supplanting of state regulation by federal regulation as a matter of fact, then we must deny the injunction and decide for the defendants.

Every federal expenditure which aids a local enterprise has some regulatory effect on the conduct of competitors. The question of degree is the controlling consideration. A man has a privately owned swimming pool as a part of a recreational enterprise in ·a small town, the American Legion Post in the small town gets an appropriation from the Public Works Administration to build a swimming pool within competitive distance. We agree that the private owner cannot complain of the loss of money due to direct competition, he has no right to be protected from such competition though financed by federal aid, but if the indirect regulatory effect goes so far as to actually and substantially amount to a regulation by the federal government instead of by the state, then there would be an invasion of rights which would offend against the Tenth Amendment and against the whole spirit of the Federal Constitution. It is on this question of degree that we think that the plaintiff has failed to make out a showing in the particular case in the light of the existing second contract. The confessed attempt of the federal Administrator to control the rates of the Duke Power Company through control over the rates to be charged by the Greenwood County finance board is removed by the change in the wording of the contract so far as the claim of right is concerned. The actual and substantial control is removed we think by a decision on the weight of the evidence and understanding of its legal effect.

As pointed out above every federal expenditure for the benefit of a local enterprise will always have some effect by way of competition on similar enterprises serving the same community. Illustrations carrying this truth to extremes could be cited—the soldier with his bonus is better able to compete with his neighbor across the street who has received no bonus and yet no one would dare to say that such competition was illegal. Many federal expenditures may have some slight regulatory effect on the business of those in competition with the recipient of the federal gift. Regulation is after all a relative term, but federal regulation to supplant state regulation so as to render such federal regulation unconstitutional must be substantial and direct, not speculative and remote. So, when viewing it from this angle, as when viewing it from every other angle, we are reminded that the solution of the case as a whole from the constitutional standpoint depends upon the degree and extent to which the whole scheme, appropriation by Congress, allocation by the Administrator, acceptance by the local finance board, and the reasonable and probable effect of all of. this tends to supplant state regulation with federal regulation. ,

So we must now examine the evidence on the regulatory feature of the case. It is here that the testimony and argument about the "yardstick" demands our attention. We think that the plaintiff has greatly magnified the importance of the yardstick in the case. To begin with, the regulatory bodies of South Carolina being specialists in the business will certainly have acumen enough to understand that, so far as the Greenwood project furnishes a yardstick to measure rates generally, it is a yardstick emanating from a very peculiar type of plant. We are certainly safe in assuming that the specialists serving on the South Carolina Public Service Commission or like body will understand that the plant is one financed entirely by loan and grant from the government. We cannot assume that the commission or regulatory body of the state is going to arbitrarily overlook this prominent factor in dealing with the regulation of the privately owned utilities operating ·in ` South Carolina. There is certainly nothing illegal in the study of the rates which will be charged

952

by the new project and nothing illegal in the ascertainment of the rates which this project would justify. If there was any certainty that a yardstick when once ascertained would be used as a basis of control and regulation of the plaintiff's rates, the situation would be quite different. Rates are as a matter of practice and constitutional guarantee fixed by regulatory boards after consideration of. investment and nature of service. We cannot assume that the South Carolina Public Service Commission or other regulatory body is going to stultify itself by failing to consider the major difference in the nature of the investment involved in the two plants. There certainly is nothing wrong in any government, state or national, spending money to investigate the facts about a given business. Time will be to complain if, after certain facts or yardsticks are ascertained, a regulatory body vested with the power seeks to apply such yardstick in an arbitrary, discriminatory, and unjust manner. To justify the granting of an injunction on the yardstick theory of the case, the plaintiff must show this court not merely that the proposed rates will supply the yardstick, or furnish from a friendly source information about the costs of producing electricity, but that this yardstick when once ascertained is about to be used by a regulatory body in an illegal manner.

We, therefore, find as a fact, which we have stated independently in our separate findings of fact filed herewith, that the evidence does not show that the construction of this plant at the Buzzard Roost location on the Saluda river will bring about such a substantial control and regulation of the plaintiff's rates as to in fact and substance supplant state regulation thereof by federal regulation. We wish to make it plain that this is a ruling on the force and effect of the evidence with respect to this particular case. It may well be that a continuation of the policy to a very widespread extent might accomplish the result which the plaintiff claims is accomplished here.

The Defendants' Contention that the Appropriation, Loan and Grant and Use of Money for the Building of the Power Plant is Justified under the General Welfare Clause of the Federal Constitution.

This phase of the case is the one most strongly relied upon by the defendants.

Of course, this contention has recently been given a new meaning by the clear acceptance of the Hamiltonian theory of the general welfare clause by the Supreme Court of the United States in the case of United States v. Butler, 297 U.S. 1, 56 S. Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. That decision sets at rest the old controversy as to the meaning of the general welfare clause in its relation to other clauses of the Constitution vesting power in the national Congress.

With all due respect to other courts, we approach this phase of the case from a slightly different angle from that used in previous decisions. Citation and increased importance attached to this new found power of expenditure for general welfare is not to be, in our opinion, a complete justification for all expenditures which Congress may see fit to make and which may be found in some way to be for the general welfare. There must be some limit to this power of expenditure. Without enumerating them all, the most important limitation on this power immediately suggests itself to us. The general welfare power may not be exercised to disturb the balance between the states and the federal government which exists under our constitutional system. The general welfare clause would become the whole Constitution if it could be used as a source of power to enable the federal Congress to subvert the whole scheme of our federal government and thereby completely substitute federal sovereignty for state sovereignty. We think that a proper interpretation of the general welfare clause depends upon a proper appraisal of the two sovereignties involved. Certainly so far as the decision of this case is concerned, it is important to read the general welfare clause in the light of the question of sovereignty. The inclusion of the general welfare clause in the Constitution and the broad interpretation recently given it by the Supreme Court does not in any way disturb the inherent sovereignty of the states making up the federal Union. But while we, as much as any court, desire to maintain the integrity of the state and see all constitutional questions from the standpoint of one who realizes that the integrity and independence of the states must be maintained, yet we do not blind ourselves to the great benefits which have come from the federal government. While states did not lose their inherent sovereignty by adopting the Consti-

tution, on the other hand the sovereignty of the nation, derivative as it is, is not the sovereignty of some far off, distant, unsympathetic power. The federal sovereignty was created in the interest of the other sovereignties and was vested with those powers that were necessary to enable it to perform those functions best to be performed by a centralized authority. Courts have found it necessary from time to time to locate the authority under our Constitution to perform certain functions and the very difficulty which the courts have in drawing the exact line is itself a proof of the intimacy of the sovereignty of the federal government with the sovereignty of the respective states. The contract embodied in the Constitution is an intimate one and must be construed in that light. The Constitution is not a nonintercourse document, it is a document which recognizes that there will be an intimacy between the states and the newly created federal sovereignty. The purpose of creating the federal government was "federal" in the original sense of that word; the states were to be tied together and the resulting compact was one of intimacy and not one of separation. We think, therefore, that there is nothing illegal or wrong from the constitutional standpoint in the fundamental principle that one sovereignty may aid another sovereignty. Certainly if the independent sovereignty of the United States may aid an independent sovereignty of an ally in war times, it should be able to aid the sovereignty of South Carolina from which it in turn draws some of its power. We cannot see why fundamentally one sovereignty may not aid another sovereignty in the accomplishment of a lawful objective. The fact that the aiding sovereignty is a federal government to which powers have been delegated in a written Constitution does not offend in any way against the fundamental conception that one sovereignty may aid another. The limitations on this aid under the United States Constitution are to be found then in the terms of the Constitution itself. The general welfare clause, therefore, as we see it, must be understood in the light of this background and be declaratory of these fundamental truths of constitutional law. The power to aid arises, we think, from a higher source than the general welfare clause itself. It arises from the nature of the sovereignty involved and is justified by the occasion provoking its exercise. Sovereignty implies the location of power and with this power goes responsibility for the welfare of the people themselves who are the original depositories of the power. The transfer of sovereignty from the people to the government is justified only on the grounds of necessity and the use of sovereignty is justified by what is necessary and best for the welfare of the whole people. This is the fundamental teaching of the Rousseauan idea of sovereignty which permeates our national and state governments. The general welfare of the people of the United States is the common concern of both the federal sovereignty, limited as it is, and of the respective state sovereignties, inherent though they be. The people of the United States are in the very nature of our government the proper destinatories of legislation passed for the general welfare.

Extended discussion by this court of its ideas of sovereignty and the constitutional issues involved would serve no useful purpose. We have developed them to some extent because we think it is necessary to do so to make plain our decision in this case. It seems that the question is to be decided in the last analysis by deciding whether or not the case presents a situation controlled by the majority opinion in the case of United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. If we come to the conclusion that the regulation of the rates of the plaintiff company is such a direct, necessary, and inevitable result of the course of conduct here contemplated as to fall within the condemnation of that opinion, then we have no alternative but to base our decision fairly and squarely on the Butler Case and find for the plaintiff. If, on the other hand, assuming that the plaintiff has a right to complain at all, we find that the regulation of the plaintiff's rates is a mere incident and collateral effect, and not substantially the direct result of the intended course of conduct, then we must deny the relief sought by the plaintiff.

Somewhere between two bold statements of the extreme positions, this case lies. The first one is the proposition laid down by the plaintiff and admitted by the defendants. Congress cannot come into South Carolina and confessedly regulate the sale of electrical energy by a private utility to a private consumer. Such a transaction is an intrastate transaction according to common sense and according to the decision of the higher courts, and Congress

cannot rob the state of South Carolina of. this right to control such transactions. The rule goes further to hold that submission by the state and consent and acquiescence by the state authorities cannot add one whit to the power of Congress over such purely intrastate transactions.

The attempted surrender of sovereignty by a state or the shifting of responsibility in return for financial aid cannot be allowed to justify damage to a private citizen. South Carolina cannot lie down and say that it will give power to the federal Congress in return for money and thereby vest regulatory power in the central government which, according to the Constitution, is left where it was originally, in the sovereign state of South Carolina and there alone. This doctrine has been so well stated by Mr. Justice Sutherland in the Carter v. Coal Company Case, 298 U.S. 238, 56 S.Ct. 855, 866, 80 L.Ed. 1160, that we refer to it here: "State powers can neither be appropriated on the one hand nor abdicated on the other. As this court said in Texas v. White, 7 Wall. 700, 725, 19 L.Ed. 227 [237], 'The preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States.' Every journey to a forbidden end begins with the first step; and the danger of such a step by the federal government in the direction of taking over the powers of the states is that the end of the journey may find the states so despoiled of their powers, or—what may amount to the same thing—so relieved of the responsibilities which possession of the powers necessarily enjoins, as to reduce them to little more than geographical subdivisions of the national domain. It is safe to say that if, when the Constitution was under consideration, it had been thought that any such danger lurked behind its plain words, it would never have been ratified."

Such a shifting of responsibility from state to federal shoulders, even if accompanied with the passage of enormous sums of money, is forbidden by our Constitution. We digress to say that it is not only forbidden by the Constitution, but that it will be the beginning of the end, and may be half the journey toward the destruction of the indestructible states making up our indestructible union. The Supreme Court of the United States condemned the purchase of compliance as the mechanics set out in the AAA statute (7 U.S.C.A. § 601 et seq.)—every court must condemn purchase of compliance seeking to accomplish an unconstitutional result, whether the compliance be by individual citizens as in the Butler Case or by responsible state officers as alleged in the case at bar.

The defendants on the other hand, in their boldest statement of their position, maintain that the general welfare clause as now interpreted by the Supreme Court in the Butler Case is a justification for practically any expenditure that inures to the general welfare of the citizens of the United States.

Therefore, deciding this case by the yardstick which was laid down in the Butler Case, we come to the conclusion that no forbidden federal regulation is shown here. In thinking about this phase of the case, we call attention to the fact that even in United States v. Butler there was nothing found wrong in the federal government promoting the general welfare by stabilizing the prices of agricultural commodities. The vice lay in the scheme adopted in that it sought to regulate in a far reaching way intrastate activities. Furthermore, we cannot divorce our thinking about the aid rendered by the central government to the state governments or their subdivisions from practical considerations which are suggested by our national history. Historically the control over the moneys of the United States has been concentrated more and more in the federal government. For some reason the federal government has been comparatively efficient in the collection of its taxes, and the securities of the federal government are rapidly absorbed on the money market. Another fact in our national history which is significant in this regard is the Sixteenth Amendment. All authorities on taxation have conceded that the income tax is a definite, easily enforced, and productive source of revenue. Taxes are valuable for the raising of revenue primarily, and other considerations thereabout are secondary. When the states, wisely or unwisely, adopted the Sixteenth Amendment they then surrendered to the national government the first call on this fertile source of revenue. Many other sources of revenue have been initially tapped by the federal

government. So on the basis of fair play it is only right that in time of emergency the central sovereignty, in strong position comparatively, should be ready to make available money and credit with which to aid local sovereignties in relief from a nation-wide depression. After all the whole body of the citizens of the United States and their welfare are the ones to be served by the exercise of sovereignty wherever located.

Relief of unemployment is the phase of general welfare most strongly relied upon in this case. It is the phase stressed in argument, because, at the time of the passage of the act and the making of the loan and grant, it was conceived to be the most pressing need of the country at large.

We are constrained to believe that relief of unemployment in and around the proposed plant at the Buzzard Roost location on the Saluda river is not such a pressing need today as it is and has been in other sections. However, we must remember that the theory of relief of unemployment embodies both the direct relief and the indirect from the aid to capital industries. Furthermore, each appropriation for the general welfare must have, as previously pointed out, a place of local incidence. The allocation of this relatively small amount of $2,800,000 for this project is not out of line with the amounts to be spent on similar projects elsewhere in the nation.

Another view of the factual situation seems to us to be significant. Greenwood County lies in the Piedmont section of South Carolina. Its chief industries are production and manufacture of cotton. By reason of the development of the Piedmont section of the Carolinas there has been an enormous increase in the last 25 years in the use of electricity in this section. Public records show that there has been an annual increase of 10 per cent. This increase has gone on despite the ebb and flow of general economic conditions. A graph of which we take judicial notice shows that in March, 1933, when conditions were at their very lowest, the consumption of electricity in this section was three and a half times the consumption in January, 1920, when general business conditions in this section registered an all time high. While Greenwood is right in the heart of this section, the evidence shows that in Greenwood County only about 15 per cent.

of the power is furnished by the Duke system; actually the larger part of the power has been supplied by local cotton mills from steam plants. The evidence supports the contention of the county authorities that, while there has been a general movement of textile plants to the South in the last 20 years, no new industries of substantial importance have been brought to Greenwood County. The opinion is held by the county that, in locating new industries to consume power furnished by the Duke Company, that company has been minded to place them closer to its center of operations—to the north and east of Greenwood County. They have felt, therefore, that if the county had a municipally owned power plant of sufficient size and built at a low cost the county would be in good position to concentrate upon bringing new industries to Greenwood County as opposed to the whole general section being served by the Duke Company. The increase in the uses of electricity by the urban and suburban residents is patent to all. A service which was regarded as a luxury some years ago is now regarded by all as a common necessity. That a service rendered to inhabitants of a municipality may as a matter of fact so change that the change must be recognized by the courts has been recently declared in a vigorous opinion of the Supreme Court. There was a time when water was supplied to municipalities by private companies, as the cities have grown a private water company has now become a rarity. Indeed, that a supply of drinking and bathing waters is a proper function of a municipal government has come to be so well accepted that the superintendent of such service has been declared by the Supreme Court to be engaged in an essential governmental function. His services are considered so important a part of the municipal government that the Supreme Court of the United States has held that his income is immune from federal taxation. Brush v. Com'r, 57 S.Ct. 495, 81 L.Ed. ——. With water so regarded we can see little difference between the service coming in underground in a pipe to a modern home from the service which is furnished by the electric power coming over wires above ground. So there is nothing novel in the operation of electric service by municipalities or the control of their use by municipal officers. Greenwood County has felt, according to the evidence, that it cannot only control the service to

be rendered its present inhabitants, but that by an intelligent operation of the plant new capital and new industries can be brought within its confines. Such competition as will result from this development is conceded by all to be lawful competition under the laws of South Carolina, even the plaintiff conceded this in pleading and at the bar of the court.

### Contention of Plaintiff that the Administrator has Adopted Criteria Other than those Set Up in the Statute. Evidence Relating to this Practice.

The plaintiff has offered in evidence a great number of documents as well as some direct testimony showing the manner in which the Administrator or his chief assistants have acted with respect to other projects. This court has thought that this testimony is admissible. It is aware that such testimony was excluded by the trial court in the District of Columbia. It also appears that this question was not dealt with by the Court of Appeals for the District of Columbia in its recent decision. The Circuit Court of Appeals of the Fourth Circuit has not specifically decided the question of the admissibility of this evidence, neither did the Supreme Court express its view thereabout on the occasion of the first appeal in the instant case. It is significant, however, we think that the Circuit Court of Appeals of the Fourth Circuit did in its opinion discuss some of the evidence of this character when ruling on the merits. The plaintiff contends that the evidence is admissible because it tends to show that the Administrator and his assistants, charged with large responsibility, had adopted a course whereby they set up the rate question as a criterion to determine whether or not a loan and grant should be made in a specific case. Of course, the controlling evidence is the evidence relating to the manner in which the instant application was considered and decided, but we do think that the evidence of the Administrator's consideration and action on similar applications made under the terms of the same statute are admissible. This is particularly true in view of the wide range of choice given to the Administrator and the fact that the statute was a new statute and, therefore, a course of conduct could only be shown by consideration of the major cases which had been handled by the Administrator under the power given to him by the new statute.

But it seems to be largely beside the point whether such evidence is admitted here or not, because the evidence constitutes records in other cases which have been decided by the courts. Manifestly such records could be resorted to to explain the real force and effect of other decisions even if they were not actually admitted in evidence in this case. It is only fair to comment that, where the decisions have been favorable to the defendant Administrator, his counsel have been most happy and willing to make use of those decisions in support of their arguments. Manifestly an offering of the record on which those decisions were based amounts to no more than bringing to this court "Transcripts of Records" in those cases. But apart from these considerations we think the evidence is admissible for the reasons stated on trial —we thought so on trial and still think so.

This evidence does tend to show two things. In the first place it tends to show that certain agents of the Administrator as well as the Administrator himself were at first very bold in the statement of the criteria they used in approving certain projects and denying others. It does support the contention that the criterion generally used was whether or not it was necessary to build a new competitive plant in order to force down the rates in a given community.

In the second place as testified by the Administrator himself in Spartanburg before Judge Watkins (evidence which under stipulation is now before this court as original evidence), there was a gradual recognition that the continued use of such a plan or scheme would endanger the constitutionality of the whole program. We might as well be frank about it, for it is clear that such decisions as Judge Watkins' original decision in this case and the opinion of the Circuit Court of Appeals in the Coeur d'Alene Case created doubts in the Administrator's own mind as to the wisdom of going too far into the rate question. Repudiation of the original position is abundantly evidenced. To name the major pieces of evidence is simply to remind ourselves of the following: A. The frank changes in the contracts; B. The appearance and testimony of Mr. Ickes himself on the rehearing of this Duke case; C. The restriction of the authority of the Electric Board of Review; D. The rebuke given to its members; E. Its final abolition and the memoranda repudiating the authority to

make certain statements which had been made by this Board.

We mention all of this because it is plain that there was an original plan to allocate funds for competitive municipal projects largely on the basis of lowering the rates in a given community. If the existing utility lowered the rates voluntarily and was rendering adequate service there would be no need to build a competitive, duplicate plant. Regardless of its effect on the final decision of the case we think that the evidence in this regard is admissible and that it shows exactly what the plaintiff contends that it shows.

But, even if there was a well thought out plan and intention on the part of the Administrator to control rates in this way, this does not in itself render the action in a given case unconstitutional. The political, social, or economic reasons behind a course of conduct of the executive officers do not decide the question of the constitutionality of their actions in a given case. Nor does the evidence which shows in a rather vivid way the mental processes through which the Administrator or his responsible assistants have gone mean that they have violated the terms of the statute under which they are acting. The political and social considerations supporting a statute are for the legislative and executive branches of the government. A court when called upon to decide the constitutionality of such conduct is dealing with a question of power and not wisdom. So with respect to the charges of the violations of the statutory standards, if the Administrator thought about the political and economic phases of the application and intended project before rendering his decision, it does not make the decision rendered a violation of the statute, if the decision is sustainable on other grounds. Alexander Hamilton in his first report on the national bank argued brilliantly for the bank as being of great value to the trade and commerce of the citizens of the United States. Later Hamilton was called upon by President Washington to render a legal opinion as to the constitutionality of the bank. In this second report we find only an argument that Congress had the constitutional power to create the bank. The fact that Hamilton had previously looked at the matter from the political, social, and economic standpoint did not detract one iota from the force of his argument on the constitution-

al power. His arguments on the second question have become accepted as sound statements of American Constitutional Law and have been so regarded for over a century.

So, while we may not agree with all that was said by the Administrator or his assistants in regard to the reasons advanced from time to time for the action taken, we cannot, for that reason, set aside the decision as to the instant project. We think that this project in Greenwood County conforms to the statutory standards.

### Unlawful Delegation of Legislative Power.

As to this contention we feel constrained to follow the decision of the Circuit Court of Appeals of this circuit as previously rendered in this case. 81 F.(2d) 986. While we are not bound by this on the theory of the "law of the case" we do feel constrained to follow it without further comment. However, since this decision and at a time when the question of unlawful delegation of power is being constantly raised before the Supreme Court of the United States, the Supreme Court has laid down the rule in strong language in Cincinnati Soap Co. v. United States, 57 S.Ct. 764, 770, 81 L.Ed. ——, opinion delivered May 3, 1937. We find the following language: "The validity of the act disposing of the tax is also attacked as constituting an unlawful delegation of legislative power. That Congress has wide discretion in the matter of prescribing details of expenditures for which it appropriates must, of course, be plain. Appropriation and other acts of Congress are replete with instances of general appropriations of large amounts, to be allotted and expended as directed by designated government agencies. A striking and pertinent example is afforded by the Act of June 17, 1902, c. 1093, 32 Stat. 388, where all moneys received from the sale and disposal of public lands in a large number of states and territories are set aside as a special fund to be expended for the reclamation of arid and semi-arid lands within those states and territories. The expenditures are to be made under the direction of the Secretary of the Interior upon such projects as he may determine to be practicable and advisable. The constitutionality of this delegation of authority has never been se-

riously questioned. See United States v. Hanson (C.C.A.) 167 F. 881, 884, 885."

While, of course, the statute there under consideration was not exactly the statute involved here, we think that this language is applicable to the statute involved in this case.

### Nature of this Suit.

This question can be disposed of very shortly. Counsel for both sides have referred from time to time to the nature of this suit. This discussion has been provoked, we think, by an undue importance attached to what has been called in these suits "The Right to Sue."

This court thinks that there is no mystery about the type of suit brought here. It is simply a suit wherein injunction is sought against state and federal officers to prevent them from invading the constitutional rights of the plaintiff. It also seeks injunction on other legal grounds. This type of suit is so common in our American jurisprudence that there is no reason for misunderstanding as to the nature of the suit. Long ago this type of suit was recognized in law. As early as Poindexter v. Greenhow, 114 U.S. 270, 5 S.Ct. 903, 913, 962, 29 L.Ed. 185, the Supreme Court said, in discussing this type of suit:

"The ratio decidendi in this class of cases is very plain. A defendant sued as a wrong-doer, who seeks to substitute the state in his place, or to justify by the authority of the state, or to defend on the ground that the state has adopted his act and exonerated him, cannot rest on the bare assertion of his defense. He is bound to establish it. The state is a political corporate body, can act only through agents, and can command only by laws. It is necessary, therefore, for such a defendant, in order to complete his defense, to produce a law of the state which constitutes his commission as its agent, and a warrant for his act. * * * The state has passed no such law, for it cannot; and what it cannot do, it certainly, in contemplation of law, has not done. * * *

"He stands, then, *stripped of his official character, and, confessing a personal violation of the plaintiff's rights, for which he must personally answer, he is without defense.* * * * That which, therefore, is unlawful because made so by the supreme law, the constitution of the United States, is not the word or deed of the state, but is the *mere wrong and trespass of those individual persons who falsely speak and act in its name."*

This decision was followed by In re Ayers, 123 U.S. 443, 507, 8 S.Ct. 164, 31 L. Ed. 216, and so on down through the decades this type of suit has been recognized and dealt with in many, many cases. It is the familiar type of suit by which the federal constitutionality of state statutes is decided in cases demanding a three judge court. Indeed such a suit is an essential factor in the "Reign of Law" as we recognize it in England and America. It is the procedural method in which persons, natural or artificial, can seek protection from administrative agencies.

No mysterious element is introduced into the case because one of the defendants is a federal officer and the other defendants are a county, existing under the state law, and the members of a board specially created by state statute. The same fundamental principles govern the procedure for hearing and deciding the respective controversies between the plaintiff and each of the defendants. A federal officer may be sued personally to prevent him from enforcing an unconstitutional statute. Such a suit is, as has been decided time without number, not a suit against the government but a suit against the officer. The fact that he may defend on the basis of the statute authorizing his action introduces no mysterious element into the suit. Nor is complexity added because a county and its officers are joined as defendants.

Some suggestions were made by counsel for the defendants as to the applicability of the Eleventh Amendment. Nothing is better settled in American jurisprudence than the rule of law that such a suit as the one here is not a suit against the state so as to deprive the federal court of jurisdiction under the terms of the Eleventh Amendment. And that question even is beside the point here for the named defendants are not even, in our opinion, officers of the state. Greenwood County is a municipal corporation existing under the laws of the state of South Carolina, but that such a municipal corporation enjoys no immunity under the Eleventh Amendment is well settled. The finance board of Greenwood County, while a group of men appointed under the terms of a state statute, have no state-wide duties to perform and would not, in our opinion, enjoy such dignity as to be protected from

suits by the Eleventh Amendment. It is familiar history that the Eleventh Amendment was passed to overrule the decision of Chisholm v. Georgia, 2 Dall. 419, 1 L. Ed. 440. It has never been successfully contended that the purpose of the Eleventh Amendment was to prevent a person, natural or artificial, from testing the constitutionality of a statute, by bringing a suit against a state officer or against a municipal corporation about to enforce a state or federal statute. From the foregoing, it is certain, we think, that this court has jurisdiction of the entire controversy here—of all the parties and of all the issues raised by the pleadings.

For the foregoing reasons, which must be read in connection with the separate findings of fact and conclusions of law which we have filed in keeping with the terms of Equity Rule 70½, 28 U.S.C.A. following section 723, we think that the plaintiff must be denied any injunction and that the bill must be dismissed on its merits.